UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00556-GNS

CHIROPRACTORS UNITED FOR RESEARCH
AND EDUCATION, LLC, et al.                                            PLAINTIFFS

v.

JACK CONWAY, et al.                                                   DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court upon Plaintiffs' Motion for Preliminary Injunction and Request for an Expedited Hearing Date and Briefing Schedule. (Pls.' Mot. for Prelim. Inj. & Req. for an Expedited Hr'g Date & Briefing Schedule, DN 3 [hereinafter Pls.' Mot. for Prelim. Inj.]). The motion is fully briefed and ripe for adjudication. For the reasons stated below, the Court **DENIES** Plaintiffs' motion.

## I.      <u>STATEMENT OF FACTS AND CLAIMS</u>

In 2006, the Board of Chiropractic Examiners amended 201 KAR Section 21:015 ("the Solicitation Regulation"). (Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 2, DN 24). It provides, *inter alia*, that "[a] chiropractor shall not contact or cause an accident victim to be contacted by the chiropractor's employee, agent, contractor, telemarketer, or anyone acting in concert with the chiropractor." 201 KAR § 21:015(1)(6)(b).

On June 11, 2014, this Court held KRS 367.409(1) unconstitutional. *State Farm Mut. Auto. Ins. Co. v. Conway*, No. 3:13-CV-00229-CRS, 2014 WL 2618579, at *14 (W.D. Ky. June

12, 2014). KRS 367.409(1) (the "Prior Solicitation Statute") provided that for a period of 30 days immediately "following a motor vehicle accident, a person . . . shall not directly solicit or knowingly permit another person to directly solicit an individual, or a relative of an individual, involved in a motor vehicle accident for the provision of any service related to a motor vehicle accident." KRS 367.409(1), *repealed by* Act of Mar. 23, 2015, 2015 Ky. Acts ch. 46, § 5. Exempt from this provision were "[c]ommunications by an insurer . . . or a [licensed] adjustor . . . or an employee of an insurer or agent." KRS 367.409(2)(b)(3).

In *State Farm*, the Court analyzed KRS 367.409(1) pursuant to *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), which governs the validity of restrictions on commercial speech. *State Farm*, 2014 WL 2618579, at *4. The Court concluded that the Prior Solicitation Statute did not advance a substantial government interest, and even if it did, the Prior Solicitation Statute was both underinclusive and overinclusive. *Id.* at *5-13. The Court found that the Prior Solicitation Statute was overinclusive because State Farm did not explain "why the state's interest in protecting the privacy and tranquility of motor vehicle accident victims cannot be equally well protected by the less burdensome alternative of a statute which prohibits solicitation only by those professions or license holders that have been shown to actually engage in abusive solicitation." *Id.* at *13.

The Court also found the Prior Solicitation Statute underinclusive because it exempted all insurers, not just the victim's own insurer, meaning that insurers of the other parties involved were "given free rein to initiate settlement discussions or other communications within the same thirty day period following an accident during which all other commercial entities are prohibited from doing so." *Id.* The Court further found the Prior Solicitation Statute underinclusive because "the statute exempt[ed] the . . . victim's own insurer despite the fact that it might be just as likely

2

as an opposing party's insurer to engage in abusive solicitation." *Id.* The Court concluded that the Prior Solicitation Statute thus violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at *13-14.

On March 23, 2015, Governor Steve Beshear signed House Bill No. 153 (the "New Solicitation Statute") into law. (Pls.' Mot. for Prelim. Inj. Ex. C, DN 3-4). It is now codified at KRS 367.4081 to .4083. The New Solicitation Statute provides that for the 30 days immediately "following a motor vehicle accident, a healthcare provider or an intermediary, at the request or direction of a healthcare provider, shall not solicit or knowingly permit another individual to solicit a person involved in a motor vehicle accident for the provision of reparation benefits, as defined by KRS 304.39-020(2)." KRS 367.4082(1). Unlike KRS 367.409, it contains no exemptions and does not mention insurers.

On June 19, 2015, Plaintiffs filed this action requesting a declaratory judgment that 201 KAR Section 21:015 and KRS 367.4081-83 are unconstitutional and seeking relief pursuant to 42 U.S.C. § 1983. (Compl. 18-20). On the same day, Plaintiffs moved for a preliminary injunction. (Pls.' Mot. for Prelim. Inj.). Defendant Attorney General Jack Conway ("Conway") has responded (Def.'s Resp. to Pls.' Mot. for Prelim. Inj., DN 25), as have the remaining Defendants (Defs.' Resp. to Pls.' Mot. for Prelim. Inj., DN 24). Plaintiffs have filed their reply, and the Court has held a hearing on the motion. (Pls.' Joint Reply in Supp. of Mot. for Prelim. Inj., DN 28 [hereinafter Pls.' Reply]; Mem. of Hr'g, DN 31). The motion is thus ripe for review.

## II.   <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy that is generally used to preserve the status quo between the parties pending a final decision of the merits of the action." *IP, LLC v. Interstate Vape, Inc.*, No. 1:14CV-00133-JHM, 2014 WL 5791353, at *2 (W.D. Ky. Nov. 6,

2014). In determining whether to issue a preliminary injunction, the Court will consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). The Court analyzes the same four factors when determining whether to issue a temporary restraining order. *See Ne. Ohio Coal. for Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The Court will make specific findings concerning each factor, "unless fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. Sch. Dist. of Ferndale*, 577 F.2d 1339, 1352 (6th Cir. 1978)).

## III.   DISCUSSION

### A.   The Solicitation Regulation

During the hearing in this matter on September 1, 2015, counsel for Defendants other than Conway reported to the Court that the Board of Chiropractic Examiners had voted to rescind the Solicitation Regulation. Accordingly, Plaintiffs' motion is moot as to the Solicitation Regulation.

### B.   The New Solicitation Statute

The Court need only address one factor in order to resolve this motion: whether Plaintiffs have a strong likelihood of success on the merits. Plaintiffs argue that there is a strong likelihood that they will prevail on the merits because: (1) the New Solicitation Statute is subject to heightened scrutiny; (2) the New Solicitation Statute cannot be upheld under the intermediate

level of scrutiny dictated by *Central Hudson* because it prohibits lawful and non-misleading activity, does not address a substantial governmental interest, the stated government interest is not directly advanced by the New Solicitation Statute, and it is more extensive than necessary; (3) the New Solicitation Statute violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and equal protection provisions of the Kentucky Constitution; and (4) the New Solicitation Statute is a prior restraint. (Pls.' Mot. for Prelim. Inj. 20-37).

### 1.    *Standard of Review*

Plaintiffs argue that, because it is a content-based restriction on commercial speech, the New Solicitation Statute is subject to heightened scrutiny. (Pls.' Mot. for Prelim. Inj. 20-23). The Court found in *State Farm* that the Prior Solicitation Statute regulated commercial speech, and was thus subject to *Central Hudson*'s intermediate scrutiny standard. *State Farm*, No. 3:13-CV-00229-CRS, 2014 WL 2618579, at *3-4. This Court is persuaded by the analysis provided in *State Farm*, but nonetheless revisits Plaintiffs' argument regarding the level of scrutiny applicable to the New Solicitation Statute.

In support of their argument that heightened scrutiny applies, Plaintiffs first cite *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1331 (M.D. Fla. Nov. 15, 2011). *Occupy Fort Myers* correctly recites the "law with respect to content based restrictions on commercial speech." (Pls.' Mot. for Prelim. Inj. 20). To that extent, it is on point. The factual scenario in that case, however, revolved around ordinances establishing a Special Events Advisory Board, requiring a permit prior to holding a parade or procession on any city street, setting business hours for parks, and prohibiting living in a movable structure in a park beyond closing hours, and prohibiting loitering or boisterousness in public parks. *Occupy Fort Myers*,

882 F. Supp. 2d at 1331-38. The ordinances in *Occupy Fort Myers* bear no relation to the substance of the New Solicitation Statute, and thus the case is inapplicable except as noted above.

Plaintiffs primarily rely on two other cases to establish the need for heightened scrutiny, the first of which is *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). In *Sorrell*, the Vermont legislature passed a law that "prohibit[ed] pharmacies, health insurers, and similar entities from selling prescriber-identifying information,"[1] except to certain groups such as "private or academic researchers," but not "to pharmaceutical marketers." *Sorrell*, 131 S. Ct. at 2662. It also prohibited the same entities from "disclosing or otherwise allowing prescriber-identifying information to be used for marketing. And it bar[red] pharmaceutical manufacturers and detailers from using the information for marketing." *Id.* at 2662-63.

The Supreme Court found that the law was content-based as it disfavored marketing, and it also was speaker-based as it disfavored pharmaceutical manufacturers. *Id.* at 2663. The result of the law was that it left "detailers no means of purchasing, acquiring, or using prescriber-identifying information." *Id.* The state argued that, content- and speaker-based restrictions notwithstanding, the law was "a mere commercial regulation," and therefore did not warrant heightened scrutiny. *Id.* at 2664.

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* The Supreme Court held, however, that Vermont's law "impose[d] more than an incidental burden on protected expression." *Id.* at 2665.

---

[1] Prescriber-identifying information is described in *Sorrell* as "[k]nowledge of a physician's prescription practices," and it is useful to pharmaceutical companies in order to send "detailers," whose job it is to bring drug samples to physicians armed with the knowledge of whether or not the physician is likely to be interested in prescribing the medicine and "how best to present a particular sales message." *Sorrell*, 131 S. Ct. at 2659-60.

The Supreme Court did *not* apply a form of heightened scrutiny to Vermont's law. Instead, it held that "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied. For the same reason there is no need to determine whether all speech hampered by [the law] is commercial . . . ." *Id.* at 2667 (citations omitted). The Supreme Court assumed that the statutory restrictions constrained commercial speech, and struck down the law as unconstitutional because it did not meet the necessary *Central Hudson* factors. *Id.* at 2667-72.

Of interest in this matter, the Court stated that "[i]t is true that content-based restrictions on protected expression are sometimes permissible, and that principle applies to commercial speech." *Id.* at 2672. The Court also noted that it has previously held that "a state may choose to regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there." *Id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388-89 (1992)). It found fault with Vermont because it did "not show[ ] that its law ha[d] a neutral justification," and that "[t]he State's interest in burdening the speech of detailers instead turn[ed] on nothing more than a difference of opinion." *Id.*

The distinctions between the New Solicitation Statute and the Vermont law at issue in *Sorrell* are legion. First, the Vermont law resulted in the complete denial of certain information, *i.e.*, prescriber-identifying information, to of a specific group of people, *i.e.*, pharmaceutical manufacturers and their detailers. The New Solicitation Statute, by contrast, both does not deny any group of people information and does not contain a complete denial of any kind. Healthcare providers are still able to acquire information that allows them to identify individuals who have been involved in motor vehicle accidents.

Second, the Vermont law constituted a flat, eternal ban on pharmaceutical manufacturer and detailers' access to prescriber-identifying information. The New Solicitation Statute limits solicitation for a period of only 30 days from the date of the injury. Healthcare providers may contact motor vehicle accident victims after 30 days and invite them to their clinics for treatment courtesy of PIP benefits.

Third, the Vermont law had no neutral justification. By contrast the New Solicitation Statute is designed, according to its legislative history, to prevent healthcare providers from fraudulently "taking up money that could go to things that the insured needs a lot more than . . . someone trying to get them to run up a lot of medical bills." (Pls.' Mot. for Prelim. Inj. Ex. E at 4). Testimony was given indicating that motor vehicle accident victims were being solicited at the scene of the accident by runners or intermediaries for healthcare providers seeking "to snag those PIP dollars before somebody else gets them." (Pls.' Mot. for Prelim. Inj. Ex. E at 9). The General Assembly's distinction between healthcare providers and insurance providers was based upon reported abuses by healthcare providers, not insurance companies.[2] (Pls.' Mot. for Prelim Inj. 26-28).

Finally, the New Solicitation Statute does not bar all access as the Vermont law did. The Vermont law prohibited all use of prescriber-identifying information for marketing purposes. The New Solicitation Statute does not bar all contact between healthcare providers and motor vehicle accident victims; rather, it bars only solicitation, which is narrowly defined to require "anticipation of financial gain or remuneration for the communication itself or for prospective charges for healthcare services." KRS 367.4081(4)(a). Northing in the statute would affect a healthcare provider's communication with an accident victim for the purpose of explaining PIP

---

[2] Abusive settlement practices by insurance companies are proscribed by Kentucky's Unfair Claims Settlement Practices Act. *See* KRS 304.12-010 *et seq.*

benefits. Moreover, advertising to the general public is excepted from the definition of solicitation, as is non-targeted telemarketing and contact between healthcare providers and individuals "with whom the healthcare provider had a preexisting provider-patient relationship." KRS 367.4081(4)(b). The New Solicitation Statute is thus far more narrowly tailored than the Vermont law discussed in *Sorrell*.

In sum, the New Solicitation Statute does not approach the level of restraint compared to the law struck down in *Sorrell*. The state's interest in the burden imposed by the New Solicitation Statute also does not turn on a mere "difference of opinion." *Sorrell*, 131 S. Ct. at 2672 (citations omitted). As the Supreme Court reiterated in *Sorrell*, a state may choose to regulate one industry but not others "because the risk of fraud . . . is in its view greater there." *Id.* (internal quotation marks omitted) (quoting *R.A.V.*, 505 U.S. at 388-89). Kentucky views the risk of PIP fraud to be greater among healthcare providers than other groups, as evidenced by the legislative history, and is thus permitted to regulate healthcare providers as a group with regard to PIP benefits. The differences between the New Solicitation Statute and the law at issue in *Sorrell* render that decision inapplicable to the facts of this case.

The second case cited by Plaintiffs in support of a heightened standard of scrutiny is *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), which addressed a code governing the placement of signs in the town of Gilbert, Arizona. *Id.* at 2224. The Court in *Reed* clarified that the "heightened scrutiny" applied to content-based speech is strict scrutiny. *Id.* at 2227. This is not groundbreaking doctrine. Clearly, the issue here hinges upon the categorization of the affected speech as content-based versus commercial. Conway argues that the speech burdened by the New Solicitation Statute is commercial speech, and therefore subject to analysis pursuant to the four-factor test enunciated in *Central Hudson*. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 6-8). It

9

is extremely persuasive that this Court found in *State Farm* that the Prior Solicitation Statute burdened commercial speech and applied *Central Hudson*. *State Farm*, 2014 WL 2618579, at *4. For much the same reasons, this Court finds that the speech burdened by the New Solicitation Statute is likewise commercial speech.

"[I]n determining whether speech may be characterized as commercial, the Supreme Court has considered the following factors: (1) whether the speech concerns a proposal to engage in commercial transactions; (2) whether the speech references a specific product; and (3) whether the speaker has an economic motivation." *Id.* at *4 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)). The New Solicitation Statute bars solicitation, which consists of communications made in "anticipation of financial gain or remuneration . . . ." KRS 367.4081(4)(a). As with the Prior Solicitation Statute, "[b]ased on this definition, the vast majority of the speech covered by the statute will consist of, or at least ultimately result in, proposals to engage in commercial transactions." *State Farm*, 2014 WL 2618579, at *4. As with the Prior Solicitation Statute, the New Solicitation Statute does not reference a specific product, but it does apply to a particular service, *i.e.*, medical care "for the provision of reparation benefits," "and therefore is likewise inherently restricted to commercial activity." KRS 367.4082(1); *State Farm*, 2014 WL 2618579, at *4. Finally, it is clear from the definition of "solicit" that the speaker must have an economic motivation in order to solicit. *See* KRS 367.4081(4)(a). Accordingly, as with the Prior Solicitation Statute, "[b]ecause all three factors indicate that [the New Solicitation Statute] extends only to commercial speech, the Court concludes that *Central Hudson*'s intermediate scrutiny standard provides the correct framework for analyzing the constitutionality of [the New Solicitation Statute]." *State Farm*, 2014 WL

2618579, at *4. Because the New Solicitation Statute constrains only commercial speech, the strict scrutiny analysis of *Reed* is inapposite.

### 2.   Central Hudson *Analysis*

Having determined that intermediate scrutiny applies, the New Solicitation Statute will be analyzed per *Central Hudson*'s four-factor test for regulation of commercial speech. "At the outset, [a court] must determine whether the expression is protected by the First Amendment." *Central Hudson*, 447 U.S. at 566. This requires, at least, that the speech "concern lawful activity and not be misleading." *Id.* "Next, [a court] ask[s] whether the asserted governmental interest is substantial." *Id.* If both of those factors are met, then a court "must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*

### a.   Constitutionally Protected

Conway does not argue that the solicitations that Plaintiffs seek to send to motor vehicle accident victims are not protected the First Amendment. Accordingly, the Court assumes that the speech burdened by the New Solicitation Statute is constitutionally protected.

### b.   Substantial Governmental Interest

Plaintiffs argue that the governmental interest that the New Solicitation Statute seeks to advance is "identical to the purpose of the prior Solicitation Statute." (Pls.' Mot. for Prelim. Inj. 25). Plaintiffs believe that the governmental interest intended to be advanced by the New Solicitation Statute is not the stated purpose of limiting PIP fraud, but rather it is "to rig the PIP system in the insurance industry's favor." (Pls.' Mot. for Prelim. Inj. 29). Conway points to the transcript of the House Labor and Industry Committee Hearing on February 23, 2015, in order to show that the substantial governmental interests advanced are "protecting the public from

personal injury protection ("PIP") fraud and protecting the privacy interests of accident victims."

(Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 8).

The testimony at the February 23, 2015, hearing clearly reflects that the interests the New

Solicitation Statute was designed to advance were those stated by Conway. Representative

Gooch testified:

> And, so what we've done is, now we have a situation where there are some other providers that are soliciting people, they are actually using runners to actually, you know, if somebody has an accident they will have these people contact folks and then they, they are trying to work around the system that way. . . . [W]hat happens is when these people fraudulently, you know, abuse [PIP benefits], they are taking up money that could go to things that the insured needs a lot more than, you know, someone trying to get them to run up a lot of medical bills.

(Pls.' Mot. for Prelim. Inj. Ex. E at 3-4). While not strictly indicative of the intent of the

legislators, Mr. Bush, a practicing attorney in Kentucky, also addressed the Committee:

> I practice in this area every day. Every day. And I see abuses of the [PIP] system. . . . I do see appropriate, you know, expenses and treatment that are provided and I see payments being made for those. But I see abuses of the system where these limited PIP medical benefits that are available to those involved in accidents are consumed by those who shouldn't be, who are over-charging, who are providing services, sometimes they charge for services that they've never provided. All that kind of thing. And all of this is exacerbated by the solicitation that goes on sometimes at accident scenes, sometimes immediately after an accident when people are most vulnerable, and they get solicited by runners or by intermediaries as the act defines them on behalf of those who want to snag those PIP dollars before somebody else gets them.

(Pls.' Mot. for Prelim. Inj. Ex. E. at 8-9). Finally, Representative Greer testified briefly in

response to Plaintiffs' counsel's testimony in opposition:

> Mr. Cox, I do dispute one thing you said and for the record I want to speak up. I've been in the insurance industry for 25 years. We encourage our adjusters to get in touch with a person that's been in an accident as quickly as possible. Now if an offer is made then that's up to the person. They're not out to cheat anybody. And I want to make sure you understand that because I've seen many an accident and many a vic- many an injured person, but the insurance industry is doing their job when they get in touch with a person right away after an accident.

12

(Pls.' Mot. for Prelim. Inj. Ex. E at 10). Insurance and insurance companies were not addressed by the legislators at all until Plaintiffs' counsel raised the issue in his testimony. (Pls.' Mot. for Prelim. Inj. Ex. E. at 5-7). It is clear from the legislative record that the concerns intended to be addressed by the statute were abusive practices by healthcare provides, not insurance companies. The Court finds, therefore, that the interests that the state seeks to advance through the New Solicitation Statute is to curb the abuse of the PIP system by healthcare providers and protect the privacy of motor vehicle accident victims. *See* KRS 304.12-010 *et seq*.

Rejecting the premise that the government interests sought to be advanced are as stated, Plaintiffs did not directly address whether such interests are substantial. Conway argues that "[t]he interest[ ] of preventing fraud . . . [has] been repeatedly recognized as [a] substantial state interest[]." (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 10). States have a compelling "interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978) (internal quotation marks omitted). The state also "bears a special responsibility for maintaining standards among members of the licensed professions," *Id.* at 460, and "has a substantial interest in 'preventing overreaching by chiropractors and their agents and regulating the profession.'" *Capobianco v. Summers*, 377 F.3d 559, 562 (6th Cir. 2004) (quoting *Silverman v. Summers*, 28 F. App'x 370, 374 (6th Cir. 2001)). *See also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("Likewise, the protection of potential clients' privacy is a substantial state interest. Even solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient.").

In this case, the Commonwealth of Kentucky has a substantial interest in regulating licensed healthcare providers, including chiropractors, and ensuring that they do not overreach

13

and abuse the PIP system. It also has a substantial interest in protecting the privacy of motor vehicle accident victims from intimidating, vexatious, or harassing solicitations.

### c.   Directly Advances

Plaintiffs again argue from the premise that the Kentucky legislature's interest was to allow insurance providers first crack at PIP benefits before healthcare providers, and thus do not address whether the New Solicitation Statute directly advances the substantial government interests that this Court has found. Conway argues that the New Solicitation Statute addresses a real harm, and bolsters his argument with several examples of the harm the New Solicitation Statute seeks to address. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 11-14).

"[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. The link between the harm and the restriction is "insufficient if it is irrational, contrary to specific data, or rooted in speculation or conjecture." *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) (citation omitted).

Conway attached several complaints and orders in which the Kentucky Board of Chiropractic Examiners sanctioned member chiropractors for precisely the behavior cited by legislators when discussing the New Solicitation Statute. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3). One complaint involved a patient named Sandra Nelson ("Nelson") who was solicited within days of her accident by either one of the plaintiffs or someone acting on its behalf solicited her and told her she "needed" to get evaluated by E-town Injury Center, Inc. ("E-town Injury Center")—one of the Plaintiffs in the case at bar. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 2). Nelson was also told that an attorney would be provided to sue the tortfeasor.

14

(Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 2). She declined, but was called again a week later and this time she acquiesced. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 2). E-town Injury Center treated Nelson for "a month and a half," at which point she began seeing a provider closer to her home. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 2). She then learned that E-town Injury Center had charged her twice as much as her subsequent provider, and that while her sons were examined at E-town Injury Center and charged "an outrageous amount," x-rays were never taken. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 2). The Kentucky Board of Chiropractic Examiners sanctioned the owner of E-town Injury Center for this behavior with a $1,000.00 fine and a reprimand. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 3-8).

The Kentucky Board of Chiropractic Examiners also sanctioned Michael Richter ("Richter") for three instances of improper telemarketing with much the same approach related by Nelson. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 9-14). Richter was also fined and reprimanded. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 12). One of the chiropractors employed at E-town Injury Center—John B. Cole—was similarly fined and sanctioned for one of the instances of telemarketing for which Richter was fined and reprimanded. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 16-22).

Amy Sims, an ex-employee of Crash Cash (for whom Plaintiffs Robert Kleinfeld and David Romano worked at the time) detailed a scheme in which the wife of the owner of Crash Cash masqueraded as an online journalist in order to receive police reports. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 24). These reports were then given to "representatives" who were paid according to the number of patients they convinced to seek treatment at the clinic. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 24). Some patients were seen for treatment only, and

15

others were given loans as well as treatment. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 24).

In addition, attorney T.J. Smith ("Smith") filed a complaint with the Kentucky Board of Chiropractic Examiners after learning that a client whom he represented had been contacted by Plaintiff Commerce Chiropractic and Rehab, PSC, ("Commerce Chiropractic") and told that Smith gave them her name and number. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 29-30). Smith did not give Commerce Chiropractic his client's name and number, and notes that, because she was not injured, had she chosen to seek treatment it could have constituted insurance fraud. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 29-30). Conway's exhibit also includes orders from the Kentucky Board of Physical Therapy reflecting that at least one member has engaged in the same kind of pay-for-patients and other unethical behavior. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3 at 35-53). These examples show that the type of behavior that the New Solicitation Statute seeks to restrict—invasions of the privacy of individuals recently involved in motor vehicle accidents—is a real harm. There is no evidence that healthcare providers are contacting these individuals for any reason other than to solicit them.[3] By restricting healthcare providers from soliciting such individuals for 30 days, Kentucky is directly advancing its interest in protecting the privacy of such individuals.

---

[3] Plaintiff Chiropractors United for Research and Education, LLC ("CURE") states that its purpose is to "educate [recent accident victims] within the first 30 days after an accident as to their rights to PIP benefits for any medical needs they have as a result of the accident." (Pls.' Mot. for Prelim. Inj. 13-14). While CURE's example letter is arguably educational in part, the final paragraph contains a solicitation. (Compl. Ex. D ("Because of PIP, many medical providers, *including chiropractors*, are able to treat your injuries without you incurring any out of pocket costs or settling any potential claim. Please consult an attorney for legal advice *or your local healthcare provider, including any of CURE's member chiropractors on the enclosed list*, for diagnosis or treatment." (emphasis added))). Thus, no evidence has been provided that Plaintiffs or healthcare providers in general are contacting victims of recent motor vehicle accidents for any other purpose than solicitation.

Conway also attached a report from the National Insurance Crime Bureau ("NICB") concerning Questionable Claim referrals ("QCs") in Kentucky for the years 2012-2014. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2, DN 25-2). Plaintiffs point out that the report shows that such claims have decreased from 2012-2014. (Pls.' Reply 11-12).[4] This is true even for the subcategory of "personal auto." (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2 at 4). In the relevant category of "personal auto," 1,241 QCs were received in 2012 contrasted with 1,079 QCs received in 2014, which represents a decrease of roughly 13%. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2 at 4). The next most populous category, however, is that of "personal property – homeowners," in with the NCIB received a total of 141 claims in 2014. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2 at 4). Personal auto QCs eclipse the next most populous group of QCs by almost eight times. PIP claims ranked in the top three loss types for all three years analyzed. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2 at 5). "Excessive treatment" was the top referral reason for QCs in 2014. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 2 at 7). These statistics certainly support the notion that abuse of PIP benefits is a real, not imagined, problem.

Finally, Conway includes an article that discusses the NCIB report and explains how PIP fraud occurs. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 1).

> Unscrupulous providers learn of an accident and contact people involved, who may or may not be truly injured, with a promise of a cash payment. This is then followed by a series of treatments until [PIP] benefits, usually $10,000, are used up, at which time the patient is cut loose.

(Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 1 at 2 (internal quotation marks omitted)). The article explains that "[f]requently the care is inadequate or may be totally unrelated to the injuries sustained, and patients who truly are injured may be unable to get treatment later because their

---

[4] Plaintiffs do not address the possibility that QC claims decreased from 2012 levels because of the enactment of KRS 367.409.

PIP benefits would have already been exhausted." (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 1 at 2). Such fraud not only increases automobile insurance premiums for other Kentucky residents (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. Ex. 1 at 2), it also defeats the purpose for which PIP benefits were established.

These sources show that the type of behavior that the New Solicitation Statute seeks to restrict—abuse of PIP benefits—is a real harm. The New Solicitation Statute directly advances the substantial governmental interest of curbing abuse of the PIP system by healthcare providers by disallowing healthcare providers to solicit utilization of PIP benefits, potentially fraudulently, for 30 days following an accident. Unscrupulous healthcare providers are more easily able to convince or coerce motor vehicle accident victims shortly after the accident when they are more likely to be injured, in need of money, and overwhelmed. Thirty days allows time for an individual to take full stock of his or her injuries, research available options, and choose the best course of treatment and provider. By restricting healthcare providers from soliciting such individuals for 30 days, Kentucky is directly advancing its interest in curbing abuse of the PIP system.

### d.    No More Extensive than Necessary

Plaintiffs argue that the New Solicitation Statute is more extensive than necessary, and that the Kentucky General Assembly could have more closely tailored the New Solicitation Statute around this Court's comment in *State Farm* that:

> State Farm has failed to explain why the state's interest in protecting the privacy and tranquility of motor vehicle accident victims cannot be equally well protected by the less burdensome alternative of a statute which prohibits solicitation only by those professions or license holders that have been shown to actually engage in abusive solicitation.

*State Farm*, 2014 WL 2618579, at *13; (Pls.' Mot. for Prelim. Inj. 30). The New Solicitation Statute has done exactly that: it has identified certain professions and license holders that have been shown to actually engage in abusive solicitation.[5] KRS 367.4081(1). The New Solicitation Statute thus addresses the problem of overinclusiveness that plagued the Prior Solicitation Statute.

Plaintiffs also argue that banning all solicitation, rather than simply abusive solicitation, renders the New Solicitation Statute overinclusive. (Pls.' Mot. for Prelim. Inj. 30-31). Plaintiffs, in essence, would require the Commonwealth of Kentucky to define what level and kind of solicitation is abusive for every citizen. Whether or not a solicitation rises to the level of abuse is a subjective inquiry, and any attempt to define it for all would necessarily lead to some definition that would result in a certain amount of citizens suffering from abusive solicitation by healthcare providers. Simply put, the ban on all solicitation as opposed to abusive solicitation is not overinclusive because to provide otherwise would be *underinclusive* by allowing solicitation that would be intrusive to some citizens.

In addition, the standard for this factor is not "the least restrictive means"; rather, it is whether or not "the speech restriction at issue is 'more extensive than is necessary to serve [the asserted] interests.'" *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (alteration in original) (quoting *Thompson v. W. States Med. Ctr.*, 525 U.S. 357, 367 (2002)). "[T]here must be a 'reasonable fit between the legislature's ends and the means chosen to accomplish those ends . . . .'" *Id.* (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)).

Applying this standard, Conway argues that the New Solicitation Statute is a "reasonable fit" because it regulates only the healthcare providers, *not* the motor vehicle accident victims

---

[5] Defendants have cited to complaints of abuses by other professions, not just chiropractors. (Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 3, DN 25-3).

who are free to seek out such providers during the 30 day period. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 15). Conway also argues that the new statute's exemption of preexisting provider-patient relationships also creates a reasonable fit between statute and goal. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 15). Conway's most persuasive argument, however, is the comparison between the New Solicitation Statute and other such regulations that have been upheld by other courts.

Conway first cites *Capobianco v. Summers*. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 16 (citing *Capobianco*, 377 F.3d 559)). *Capobianco* discussed a regulation propounded by the Tennessee Board of Chiropractic Examiners, the pertinent portion of which provided that "[t]elemarketing or telephonic solicitation by licensees, their employees, or agents to victims of accidents or disaster shall be considered unethical if carried out within thirty (30) days of the accident or disaster, and subject the licensee to disciplinary action . . . ." *Capobianco*, 377 F.3d at 561. The Sixth Circuit denied a preliminary injunction to Capobianco after finding that the regulation was constitutional under the *Central Hudson* test, and thus that Capobianco "ha[d] demonstrated little likelihood of succeeding on the merits . . . ." *Id.* at 564.

Conway then cites *McKinley v. Abbott*, 643 F.3d 403 (5th Cir. 2011). At issue in *McKinley* was a provision of the Texas Penal Code that regulated "solicitation of professional employment by an attorney, chiropractor, physician, surgeon, or private investigator licensed to practice in the state or any person licensed, certified, or registered by a health care regulatory agency of the state." *McKinley*, 643 F.3d at 404 (internal quotation marks and alterations omitted). It likewise contained a 30-day ban on a communication or solicitation concerning "an action for personal injury or wrongful death or otherwise relat[ing] to an accident or disaster involving the person to whom the communication or solicitation is provided or a relative of that

20

person . . . ." *Id.* at 405. The Fifth Circuit found that the statute met the requirements of *Central Hudson* and was therefore constitutional. *Id.* at 409.

Finally, Conway cites *Walraven v. N.C. Board of Chiropractic Examiners*, 273 F. App'x 220 (4th Cir. 2008). The statutes at issue in *Walraven* "preclude[d] Walraven [a chiropractor] and/or anyone acting on her behalf from soliciting, either in person or telephonically, prospective patients who may need chiropractic treatment as a result of a motor vehicle accident for a period of 90 days following the accident." *Walraven*, 273 F. App'x at 222-23. The Fourth Circuit held that the statutes were constitutional pursuant to *Central Hudson*. *Id.* at 226.

From these cases, it is clear that the New Solicitation Statute is no more extensive than necessary, particularly in light of the fact that a time period 3 times longer than the 30-day ban dictated by the New Solicitation Statute has been upheld.  Because the New Solicitation Statute meets all of the requirements of the *Central Hudson* test, Plaintiffs have not shown a substantial likelihood of success as to their First Amendment claim.

### 3. <u>Equal Protection</u>

Plaintiffs next argue that the New Solicitation Statute violates the Equal Protection Clause of the United States Constitution and the equal protection provisions of the Kentucky Constitution. (Pls.' Mot. for Prelim. Inj. 31-33). Section 1 of the Fourteenth Amendment to the United States Constitution states, in relevant part, "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. In considering challenges pursuant to the Equal Protection Clause, the threshold question is which level of scrutiny to apply, as courts "apply different levels of scrutiny to difference classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

21

"Because regulation of commercial speech is subject to intermediate scrutiny in a First Amendment challenge, it follows that equal protection claims involving commercial speech also are subject to the same level of review." *Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001) (citation omitted). *See also State Farm*, 2014 WL 2618579, at *14 (quoting *Chambers*, 256 F.3d at 401). The Court has already determined that the New Solicitation Statute passes intermediate scrutiny under *Central Hudson*. Accordingly, it also passes intermediate scrutiny for the purposes of the Equal Protection Clause contained in the Fourteenth Amendment to the United States Constitution.

"The Kentucky Constitution's equal protection provisions, Sections 1, 2, and 3, are much more detailed and specific than the Equal Protection Clause of the United States Constitution . . . ." *Elk Horn Coal Corp. v. Cheyenne Res., Inc.*, 163 S.W.3d 408, 418 (Ky. 2005) (citation omitted). Instead of rational basis review, Kentucky courts "have construed [the Kentucky] Constitution as requiring a 'reasonable basis' or a 'substantial and justifiable reason' for discriminatory legislation in the areas of social and economic policy." *Id.* The second categorization, "substantial and justifiable reason," correlates on its face with the *Central Hudson* test for commercial speech, which requires a substantial government interest and requires the law in question to directly advance the interest in a way that is no more extensive than necessary. *Central Hudson*, 447 U.S. at 566.

Other Kentucky case law suggests that "substantial and justifiable reason" may simply mean "rational basis." *Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 466 (Ky. 2011); *Cain v. Lodestar Energy, Inc.*, 302 S.W.3d 39, 43 (Ky. 2009) ("We discern no *rational or reasonable basis* for such discrimination . . ." (emphasis added)). In any case, it appears that the standard under Kentucky's equal protection provisions is no higher than the intermediate scrutiny required

by the United States Constitution. Accordingly, the New Solicitation Statute does not violate the equal protection granted by the United States or Kentucky Constitution.

### 4.  **Prior Restraint**

Finally, Plaintiffs argue that the New Solicitation Statute is an unconstitutional prior restraint on speech. (Pls.' Mot. for Prelim. Inj. 33-37). "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original) (citation omitted). "Under a system of prior restraint, the lawfulness of speech turns on the advance approval of government officials." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001) (citation omitted). "[T]raditional prior restraint principles do not fully apply to commercial speech . . . ." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 668 n.13 (1985).

The New Solicitation Statute constitutes a subsequent punishment rather than prior restraint, as it does not require the advance approval of governmental officials. (Def.'s Resp. to Pls.' Mot. for Prelim. Inj. 21). "The First Amendment . . . accords greater protection against prior restraints than it does against subsequent punishment for a particular speech." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 589 (1976). It does not "prevent the subsequent punishment of [communications] as may be deemed contrary to the public welfare." *Near v. State of Minn. ex rel. Olson*, 283 U.S. 697, 714 (1931) (citations omitted).

The New Solicitation Statute is not a prior restraint. Healthcare providers are not required to petition a governmental official or group of governmental officials for permission to solicit motor vehicle accident victims. Instead, the New Solicitation Statute subsequently punishes

23

those who engage in a particular form of a speech at a particular time. Accordingly, the New Solicitation Statute does not improperly impose any prior restraint on speech.

## IV.  <u>CONCLUSION</u>

For the reasons detailed above, none of Plaintiffs' claims are likely to establish Plaintiffs' entitlement to the relief requested. Because Plaintiffs have not shown that they are likely to succeed on the merits of this case, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction and Request for an Expedited Hearing Date and Briefing Schedule (DN 3) is **DENIED**.

**Greg N. Stivers, Judge**
**United States District Court**
October 1, 2015

cc:     counsel of record

24